1    **LTL ATTORNEYS LLP**
     David W. Ammons, SBN 187168
2    Caleb H. Liang, SBN 261920
     300 S. Grand Ave., Suite 3950
3    Los Angeles, CA 90071
     Tel: (213) 612-8907
4    david.ammons@ltlattorneys.com
5    caleb.liang@ltlattorneys.com

6    *Attorneys for Plaintiff Nicole Rieger,*
     *individually and on behalf of all others*
7    *similarly situated*

8

9                 **UNITED STATES DISTRICT COURT**

10               **NORTHERN DISTRICT OF CALIFORNIA**

11

12   NICOLE RIEGER, individually and on behalf    | Case No.:  3:25-cv-04793
     of all others similarly situated,
13                                                 | **CLASS ACTION COMPLAINT**
                        Plaintiffs,
14                                                 | JURY TRIAL DEMANDED
          v.
15   EPIQ SYSTEMS, INC., ANGEION GROUP            | 1. Breach of Fiduciary Duty
     LLC, JND LEGAL ADMINISTRATION,               | 2. Fraud
16   KROLL SETTLEMENT ADMINISTRATION              | 3. Sherman Act, Section 1
     LLC, HUNTINGTON NATIONAL BANK,               | 4. Sherman Act, Section 1
17   WESTERN ALLIANCE BANK, and DOES 1-           | 5. RICO
     20,                                          | 6. RICO Conspiracy
18                      Defendants.                | 7. Breach of Implied Contract
19                                                 | 8. Unjust Enrichment/Quantum Meruit
                                                   | 9. Unfair Competition Law, Cal. Bus. & Prof.
20                                                 | Code § 17200 *et. seq.*

21

22

23

24

25

26

27

Plaintiff Nicole Rieger ("Plaintiff"), individually and as a representative of classes of similarly situated persons, brings this action against Defendants Epiq Solutions, Inc. ("Epiq"), Angeion Group LLC ("Angeion"), JND Legal Administration ("JND"), and Kroll Settlement Administration LLC ("Kroll") (collectively the "Administrator Defendants"), in addition to Huntington National Bank ("Huntington") and Western Alliance Bank ("Western") (collectively the "Bank Defendants") (the Administrator Defendants and Bank Defendants are collectively referred to as "Defendants" or "Co-Conspirators"). The allegations stated herein are based on information and belief, including through investigation conducted by and through Plaintiff's counsel, except as to those allegations pertaining to Plaintiff herself.

## **NATURE OF THE ACTION**

1.    The vast majority of class actions are settled. When a class action is settled, there is ordinarily many months or even years between the time when a settlement is agreed to, and the money paid by the defendant, and the time when the money is distributed to members of the class.

2.    For example, generally before money can be distributed, members of the class must receive notice of the settlement, be given any opportunity to object and opt out, file a claim, and have their claim reviewed and approved. The settlement must also be approved by the court presiding over the case, which involves both preliminary approval (which may or may not require a hearing) and final approval (which follows notice and an opportunity to object and virtually always requires an evidentiary hearing).

3.    If anyone objects to a settlement, which is common, and the settlement is ultimately approved, the objector has a right to appeal, and any distribution of funds must await the result of that appeal.

4.    As a result of the many steps between settlement and the distribution of the money recovered to class members, the time required varies from several months to a number of years.

5.    During the period between the time settlement proceeds are paid by a defendant and the time the proceeds are distributed to class members, the money must be deposited in a bank both for safe-keeping and to earn interest. Because class action settlements often amount to

1   hundreds of millions or billions of dollars, the amount of interest that can be earned during this
2   time is large.

3        6.    Class action administrators, like the Administrator Defendants in this case, are
4   responsible, among other things, for providing notice to class members, reviewing and approving
5   claims, and ultimately distributing funds to class members. They also ordinarily participate in the
6   selection of the bank where settlement funds are deposited pending distribution to class members.

7        7.    Class action administrators, including the Administrator Defendants, owe fiduciary
8   duties to the class members whom they serve. They also owe duties to the Court who approves
9   their appointment.

10       8.    Class action administrators, including the Administrator Defendants, represent that
11  they select banks to hold settlement funds based on their judgement of which bank will best serve
12  class members interests.

13       9.    However, in fact the Administrator Defendants have agreed, in exchange for secret
14  kickbacks, to divert settlement deposits to the Bank Defendants even though the Administrator
15  Defendants know those banks pay a lower rate of interest than the rate paid by major banks that
16  do not pay kickbacks.

17       10.   The Bank Defendants' kickbacks are paid with the specific purpose and intent of
18  inducing the Administrator Defendants to breach their duties, undertakings, and representations
19  to and for the benefit of the class members whose money the Administrator Defendants
20  administer.

21       11.   The Administrator Defendants—Epiq, Angeion, JND, and Kroll—are four of the
22  largest providers of class action settlement administration services in the United States (the
23  "Administrator Market"). Together, they control over 65% of the Administrator Market. As the
24  entities appointed by the Courts to administrate the disbursement of class settlement funds to class members,
25  the Administrator Defendants have a direct relationship with the Courts and class members, as their duly
26  appointed fiduciaries.

27       12.   Plaintiff now brings this action against the Administrator Defendants, for engaging in
28  a deceptive and anticompetitive scheme to reap hundreds of millions of dollars in undisclosed

kickbacks and compensation from the Bank Defendants, while increasing the costs and depressing the payouts on thousands of class actions. Some time on or about 2021 – when the interest rates in the United States started rising – Administrator Defendants entered into an ongoing agreement with each other to increase the cost and price of class administration services, including by having Bank Defendants pay them the interest and investments earned on class action settlement deposits that would have otherwise been distributed to class members and used to pay down the cost of class administration services.

13. Defendant Huntington's parent company Huntington Bancshares Inc. (Nasdaq: HBAN) and Defendant Western's parent company Western Alliance Bancorporation (NYSE: WAL) are publicly traded companies. Defendant Huntington and Defendant Western are federally chartered banks.  Together the Bank Defendants control over eighty percent (>80%) of the settlement funds in class and mass actions (herein after the "Settlement Deposit Market") in the United States. Like the Administrator Defendants, the Bank Defendants are fiduciaries of the class members in thousands of class and mass actions every year, duly appointed and supervised by the Courts.

14. To maintain their market power in the Settlement Deposit Market, the Bank Defendants agreed to work with the Administrator Defendants looking to increase the cost and price of class administration services and pay the Administrator Defendants the kickbacks. In exchange, the Administrator Defendants agreed to keep all of the settlement funds from the thousands of class actions with the Bank Defendants. The Bank Defendants thereby maintained their power in the Settlement Deposit Market, leading to steady profits and liquidity for the Bank Defendants.

15. The Bank Defendants thereby conspired with the Administrator Defendants, and entered into these agreements deliberately, corruptly, and with intent to execute the kickback scheme. Indeed, the Administrator Defendants took cautious measures to conceal their receipt of kickbacks, including by forming special purpose entities ("SPEs") to facilitate the kickback scheme. For their part, the Bank Defendants paid the kickbacks into these SPEs, which they knew was for the purpose of sending kickback payments to the Administrator Defendants without

detection. This arrangement has been going on for years, including throughout the class period, without any disclosure to the Courts, class counsel, or consumers/class members to whom the Defendants are fiduciaries.

16.  The kickback scheme perpetuated by the Defendants is the epitome of self-dealing. Plaintiff brings this action to bring an end to Defendants' clandestine practices, enjoin them from continued use of the kickbacks for their own benefit, to compensate the class members for the harm caused by Defendants' illegal conduct, and to stop the anticompetitive practices that the Defendants have carried on, which has depressed payouts substantially in class actions in the United States.

## JURISDICTION AND VENUE

17.  This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d). The amount in controversy in this Class action exceeds $5,000,000, exclusive of interest and costs, and Plaintiff as well as numerous Class members are citizens of states other than the state of Defendants' citizenship.

18.  This Court has personal jurisdiction over Defendants because they are corporations that regularly conduct business in this District. Defendants' conduct involves thousands of class action settlements that were litigated, settled, or administered in this state, harming millions of citizens of this state. At all times relevant, the State of California had the largest number of class action settlements in the United States, by most measures, and Defendants were all involved in hundreds of class actions in California as administrators and trustee banks.

19.  Further this Court has jurisdiction under RICO pursuant to 18 U.S.C. § 1964.

20.  Venue is proper in this District under 28 U.S.C. §1391(b) because all Defendants regularly conduct business in this District.

## THE PARTIES

### Plaintiff

21.  Plaintiff Nicole Rieger, a citizen of California, was a class member in *In re: Yahoo! Inc. Customer Data Security Breach Litigation*, Case No. 16-md-02752-LHK (N.D. Cal.), a class action settlement for which an Administrator Defendant served as the court-approved settlement

administrator who then used a Bank Defendant to hold and disburse the funds.

22. In connection with settlements like this one and those discussed below, class members and individuals all over the country received class and mass action settlement disbursements from Defendants. Unbeknownst to them, Defendants, and/or their wholly owned subsidiaries, siphoned undisclosed kickbacks from the Bank Defendants from the settlement funds, none of which were disclosed to the Courts, class action counsel, or the class members, including Plaintiff.

**Defendants**

23. Defendant Epiq Systems, Inc., ("Epiq") is a Delaware corporation that maintains its principal executive offices at 501 Kansas Avenue, Kansas City, Kansas 66105. Defendant Epiq is the largest settlement administration company in the country. Plaintiff is informed, and on that basis believes and alleges, that Epiq's market share in the Administrator Market is approximately 50%.[1]

24. Defendant Angeion Group ("Angeion") is a class action administration company that maintains its principal executive offices at 1650 Arch Street, Suite 2210, Philadelphia, Pennsylvania 19103. Defendant Angeion is one of the major settlement administration companies in the country.

25. Defendant JND Legal Administration ("JND") is a class action administration company that maintains its principal executive offices at 1201 2nd Ave Suite 3400, Seattle, WA 98101. Defendant JND is one of the major settlement administration companies in the country.

26. Defendant Kroll Settlement Administration LLC ("Kroll") is a class action administration company that maintains its principal executive offices at 285 Fulton St., 31st Fl., New York, NY 10007. Defendant Kroll is one of the major settlement administration companies in the country.

27. Defendant Huntington National Bank ("Huntington"), is a regional bank holding company that is FDIC insured and federally chartered, maintaining its principal executive offices

---

[1] See e.g., https://www.issgovernance.com/library/the-top-100-us-class-action-settlements-of-all-time-as-of-december-2023/ (last visited May 25, 2025).

in Columbus, Ohio. Defendant Huntington is a subsidiary of the publicly traded company Huntington Bancshares Inc. (NASDAQ stock symbol HBAN). Defendant Huntington is one of two major banks in the Settlement Deposit Market, with the largest market shares in that market.

28.   Defendant Western Alliance Bank ("Western") is a federally chartered bank and is a subsidiary of a publicly traded company, Western Alliance Bancorporation (NYSE stock symbol WAL), that maintains its principal executive offices at Phoenix, Arizona. Defendant Western is one of two major banks in the Settlement Deposit Market, with the largest market shares in that market.

29.   Defendant DOES 1-20 (collectively with the defendants identified above referred to as the "Defendants") are fictitious names of currently unknown individuals/entities that were also involved with the conduct described in this Complaint who have not yet been identified and are jointly responsible for Defendants' actions.

## FACTUAL ALLEGATIONS

### *The Class Action Settlement Administration Industry & the Administrator Defendants*

30.   Administrator Defendants are routinely referred by class counsel, subject to court approval, to provide settlement administration services in class actions. This is in part because it is more efficient for courts to outsource the administering and managing of class action settlements (e.g., mass mailing millions of class members, answering all of their questions, etc.). When there is a class settlement, class members are entitled to know the terms of the settlement offered to the class by the defendant, ask questions about the case and settlement, and review all documents relating to the proposed settlement. The courts have neither the resources nor the staff to answer the questions and provide the support needed by hundreds of millions of consumers that are part of class actions every year.

31.   The class action administration industry therefore grew into a multibillion-dollar industry to support the courts and class action litigants, where administrators advertise their skills and integrity as fiduciaries for class members, acting under the supervision of the courts.

32.   Defendant Epiq, advertises itself on its webpage as the "best-in-class" administrator

1    to consumers and the Courts, allegedly providing clients "clarity" and "confidence":[2]



14    Epic also claims that its administration services ensure "accuracy and efficiency":[3]



25    33.    Similarly, Defendant JND claims that it is one of the largest and most trusted

[2] https://www.epiqglobal.com/en-us/services/class-action-mass-tort/class-action-administration (last visited May 25, 2025).

[3] https://www.epiqglobal.com/en-us/services/class-action-mass-tort/class-action-administration/claims-administration (last visited May 25, 2025).

administrators in the industry:[4]



34. Defendant Angeion publicly advertises itself as an "efficient" and trusted "industry leader" amongst class action administrators:[5]



35. Defendant Kroll advertises itself on its webpage as having "comprehensive expertise in complex settlement administration" and "best-in-class claims administration" with a "focus on quality" that ensures accuracy.[6]

**Why Choose Kroll**

▶ **Best-in-Class Claims Administration**

Our focus on quality ensures more accurate claims handling, speed, and responsiveness. We provide end-to-end digital solutions encompassing notice, claim filing, receipt of supporting documentation, corresponding with class members, clearing deficiencies and/or rejections and digital disbursements and much more.

---

[4] https://www.jndla.com/about-us#jnd-fact-sheets (last visited May 25, 2025)
[5] https://www.angeiongroup.com/class-action/claims-administration (last visited May 25, 2025)
[6] https://www.kroll.com/en/services/settlement-administration (last visited June 5, 2025)

CLASS ACTION COMPLAINT

8

36.   The appointed administrator duties for the Administrator Defendants in class actions typically include: (a) gathering and managing data related to class members; (b) sending notices to class members to inform them about the terms of the settlement and their options (e.g., how to submit a claim, how to opt out of the settlement class, how to object to the settlement and/or appear at the final fairness hearing); (c) maintaining the websites where class members can review the terms of the settlement and obtain court filings and documents; (d) notifying regulators, including State Attorney Generals, of the settlement; (e) handling and responding to questions from class members; (f) receiving and reviewing claim forms submitted by class members; (g) verifying claimants' eligibility to participate in the settlement; (h) ensuring the claim review, objection, and submission process complies with court orders; (i) providing additional instructions to the Bank Defendants on the Qualified Settlement Fund ("QSF") established under Treasury Regulation § 1.468B3(e)(2)(ii), also known as a "Section 468B trust," deposited with the Bank Defendants; and (j) facilitating the distribution of the settlement funds to eligible class members with the Bank Defendants (i.e., providing instructions to Bank Defendants on who needs to be sent disbursements and how much).

37.   Administrator Defendants are fiduciaries of consumers managed by the presiding courts, who duly appointed them for the benefit of class members. As fiduciaries, Administrator Defendants have legal and ethical obligations to act in the best interests of the beneficiaries (i.e., Plaintiff and Class Members), including ensuring that the QSF funds are handled responsibly and in accordance with the settlement agreement, applicable regulations, and court orders on administration. *See*, *e.g.*, *Nolte v. Cigna Corp.*, No. 07-2046, 2013 WL 3586645, at *4 (C.D. Ill. July 3, 2013) ("The oversight of the Settlement Fund is the responsibility of the Settlement Administrator.").

38.   To complete the class administration of class actions and mass actions, class counsel often solicit competing bids from several class administrators. This is because the costs of claims administration are typically paid out of the total settlement fund. Thus, payments made to class administrators diminishes the funds available for distribution to the class members. In most cases, the compensation paid to the class administrator is one of the largest expenses of

settlement administration. Thus, to secure their court appointments, Administrator Defendants must submit detailed proposals that describe the scope of services they provide and the supposed associated costs. These are reviewed and approved directly by the court as part of the "preliminary approval" and "final approval" processes, only after the court reviews and agrees that what the class administrator proposed is a competitive proposal.

39. The Administrator Market is a relevant and unique market because class action administrators provide specialized expertise and skills that others cannot readily provide. Class actions can present complicated problems, especially when it comes to large scale class actions with tens of millions of class members. Class settlements may have varied and tight deadlines for specific industries or peculiar notices. Administrators need to know how to handle huge volumes of incoming calls and questions, answering them accurately and within the parameters of the settlement. Administrators need to know how to assess objections, filled out forms, and when additional questions need to be asked of the counsel or court. And administrators need to know how to accurately disburse and track the tens to hundreds of thousands of claim payments made.

40. The Administrator Defendants together – specifically Epiq, Angeion, JND, and Kroll – control well-over more than 65% of the market share of class action administration services. They are recognized as household names in the class action administration industry. The Administrator Defendants dominate popular class action websites such as www.classaction.org, where they typically have to post notices and provide documents.

### ***The Qualified Settlement Fund Accounts Industry & the Bank Defendants***

41. As further described herein, the Administrator Defendants were financially motivated to refer most of their class action settlement deposits to the Bank Defendants (and not the Bank Defendants' competitors), because both groups were financially motivated to maintain their anticompetitive and deceptive scheme.

42. The Settlement Deposit Market is a relevant and unique market because handling Section 468B trust-accounts requires expertise and class action experience. Managing such trusts requires large quantities of disbursements at scale, and the pertinent IRS-regulations demand

special handling throughout the life of the deposit. Once a class settlement is approved, the trustee bank typically has to cut thousands to hundreds of thousands of checks or distribute other forms of payments quickly and accurately, while complying with the strict requirements imposed by the court orders and the IRS, in addition to class action administrator instructions.

43.  This requires a scale and expertise that most banks do not have. Investment in the practice must be made for any competing bank to meet the rigorous requirements and demands of how QSF accounts are used for class action settlements.

44.  The Bank Defendants' settlement deposit services in the Settlement Deposit Market include: (a) setting up and managing the QSFs funds (i.e., A Section 468B trust) established under Treasury Regulation § 1.468B3(e)(2)(ii), including opening accounts, reconciling accounts, fund recordkeeping, and ensuring proper tax reporting; (b) investing the QSF funds, and managing the investments properly; (c) regularly reporting to the class administrators and Courts (both directly and indirectly through the class administrators); (d) cutting checks and/or issuing payments selected by the class members; (e) managing and reconciling the QSF fund during the class member deposit and redemption process; and (f) paying out interests and other returns on the deposits and investments, during reconciliation and reporting to the supervising courts.

45.  The need for scale and scalability is a barrier of entry in the Settlement Deposit Market. To cut thousands to hundreds of thousands of checks and distribute other payments quickly and accurately, banks not only need to invest in technology, but qualified staff. The technology and staff also need many accounts and disbursements to sustain them, because such large teams need to be sustained with steady work to stay profitable.

46.  That scale and scalability are critical as evidenced by how both Defendants Huntington and Western typically oversee thousands of class action QSF-accounts at any given time. Plaintiff and her counsel are informed, and on that basis believe and allege, that no other banks have as many QSF-accounts as Defendants Huntington and Western, who together control over 80% of the market.

47.  Another important barrier to entry to the Settlement Deposit Market is the long-standing relationships between class action administrators and trustee banks. The major class

administrators tend to be responsible for hundreds, if not thousands of class actions, at the same time. If any major administrator has a long-standing relationship with a trustee bank, the referral relationship can present a major barrier of entry to new entrants.

48.  In addition, partially due to the unprecedented low interest rates between 2010 and 2020, the number of banks competing for QSF accounts had dwindled, leaving primarily the duopoly of Defendants Huntington and Western intact. Scale ensured viability and profitability when interest rates were low.

49.  Once interest rates increased quickly in the United States, starting in or about 2021, the Bank Defendants were highly motivated to maintain their substantially increased profits and market power, including by acting in concert to fix and maintain returns on QSF accounts.

50.  Nonetheless, the Bank Defendants recognize the fiduciary nature of their role in the class action settlement process. For example, Defendant Huntington in its marketing materials discusses its "extensive experience" while recognizing that it takes on a "fiduciary role" in each and every case:[7]

https://www.huntington.com/Commercial/industries/settlement-funds-services

**COMMERCIAL › INDUSTRIES › SETTLEMENT FUNDS SERVICES**

## National Settlement Funds

Our National Settlement team has extensive experience working with law firms, claims administrators, and regulatory agencies in the class action, mass tort, and settlement administration industry.

We recognize the importance of your fiduciary role in settlement administration and offer a full suite of products, services, and support to help you navigate through every step of the process.



51.  Defendant Western, for example, advertises that its administration team offers "exceptional service…and integrity" in the provision of QSF account services:[8]

---

[7] https://www.huntington.com/Commercial/industries/settlement-funds-services (last visited March 25, 2025).
[8] https://www.westernalliancebancorporation.com/industry-expertise/legal#3159568222-1752007178 (last visited March 25, 2025).

***The Class Action Settlement Fiduciary Selection Process: Preliminary and Final Approvals***

52.   Class action settlements are typically deposited into a QSF, in the custody of a trustee bank, to be administered by a class action administrator, subject to direct oversight and review by the court.

53.   To select the fiduciaries to administer and dispense the settlement, class counsel typically solicits competing bids from class administrators and trustee banks. These bids would often come in the form of competing term sheets. The terms are not binding on the class members or courts, because it is the supervising court who must ultimately review and approve the terms proposed as part of the "preliminary approval" and "final approval" class action process.

54.   Specifically, upon a class action settlement, the parties would typically first apply to the court presiding over the litigation for preliminary approval. The court reviews all material terms of the settlement agreement, on behalf of the settlement class. When a class administrator and trustee bank for the QSF funds are proposed, the court requires that the parties involved fully disclose all material terms for their appointment. Only then can the proposed terms of the class administrator be approved.

55.   If a court finds a settlement agreement submitted preliminarily agreeable, it will issue

an Order of preliminary approval on the condition that the class be notified of the terms of the settlement, and be given an opportunity to review the settlement, ask questions, and object if necessary. As part of this preliminary approval the court would appoint a class action administrator and trustee bank for the QSF funds, as fiduciaries for the settlement class. The administrator would be responsible for handling the administration of the settlement, and the trustee bank would be responsible for holding and ultimately distributing the QSF funds.

56.  If the class members object to the settlement, the court will hear and consider the objections. If the class members do not object, or if objections are otherwise overruled, the court will proceed onto a review and hearing for final approval of the settlement.

57.  Between the issuance of preliminary approval order and the final approval hearing, class members receive notice regarding the proposed settlement through the class administrator. The notices are supposed to include all material terms and conditions of the proposed settlement, so that the class members can review, assess, and ask questions. The notices are sent in some combination of postal mail and electronic mail ("Mail Notices"), in addition to publication by websites ("Website Notices") and/or newspapers of general circulation.

58.  Sometimes, when the courts consider objections raised, the settlement funds sit in the QSFs longer than the parties anticipated. The objections may lead to additional litigation, hearings, and appeal. During this time, the deposited funds are supposed to accrue interest or otherwise be invested to increase value, for the benefit of the class.

59.  As part of this approval process, the Administrator Defendants are almost always required to send notices to the State Attorney Generals (AGs), pursuant to the Class Action Fairness Act (CAFA), 28 U.S.C. §§ 1332. The terms of the settlement, including all material terms, are supposed to be disclosed to the AGs, so that any AG may object to a settlement it finds unreasonable. If an AG chooses to object – such as if it had found that there was an illegal and unconscionable payment to a party or third-party – the AG or a coalition of AGs may file objections with the reviewing court, or appear at the final approval hearing to explain their objections.

60.  Once the time to object has lapsed and objections have otherwise been disposed of,

the court prepares its final approval after the conclusion of the final approval hearing. The court conducts a careful review of not just the material terms of settlement, but also reports from the class administrator and the trustee bank holding the QSFs. The trustee bank provides a final account on the QSF to the class administrator, supposedly containing all costs and fees incurred, which is then submitted to the court for final approval.

### ***Rising Profits For Defendants in 2021, and the Birth of an Anticompetitive Scheme***

61.    While it is unknown how long the Bank Defendants have been providing undisclosed benefits to the Administrator Defendants, Plaintiff and counsel are informed, and on that basis believe and allege, the Defendants' anticompetitive scheme began sometime around 2021, resulting from the sudden rise of interest rates.

62.   Sometime around 2021, the potential for substantial profit on the QSF deposits became clear to the Bank Defendants. There were billions of dollars in potential deposits available from class action settlements every year, and the prospect of using these massive quantities of cash to create liquidity and investments was irresistible.

63.   Plaintiff and counsel are informed, and on that basis believe and allege, that Administrator Defendants demanded that they be given a cut of the profits, in the form of a guaranteed rate of return on the deposit, that would be lower than the floating federal window interest rate. If the Bank Defendants refused, the Administrator Defendants threatened to pull their fleet of class settlements from them.

64.   The Administrator Defendants agreed with each other that they would implement such a scheme, and each of them proceeded to act accordingly, in concert with one another. Indeed, during the times relevant, each of them made such demands on the Bank Defendants, received illegal and unfair renumerations from the Bank Defendants, and proceeded to hide these illicit transactions for themselves, and for each other.

65.   One of the important effects of these concerted actions by the Administrator Defendants is that it raised the price of class action settlement administration services, and lowered the total payouts to class members. Had the secret renumerations to the Administrator Defendants not been made, more money would have been paid to Plaintiff and Class Members,

1    either as a result of reduced costs of administration or in the form of higher interest payments, or

2    both.

3    66.   To meet the Administrator Defendants' demands, the Bank Defendants also passed

4    off the costs to the class members who have a right to the QSF deposits (and any accruing

5    interest), by uniformly offering class members below-market interest rates, often at rates lower

6    than 0.5%. The rates provided by the Bank Defendants would have been significantly higher in

7    a competitive market absent such collusion.

8    67.   Plaintiff and counsel are informed, and on that basis believe and allege, that the

9    anticompetitive scheme had the further effect of depressing interest rates in the Administration

10   Deposit Market for the few class actions where interest rates higher than 0.5% per year was paid.

11   The rates on those cases were still ultimately lower than what the rates would have been in a

12   competitive market, because the Bank Defendants not only had to act in concert, but were afraid

13   that non-participants and customers would find out about their anticompetitive scheme. Thus,

14   and even then, the Bank Defendants continued to collude and report the same interest rate offered

15   for prospective QSFs.

16   68.   For example, Plaintiff's counsel is informed and believes that as of March 2025, both

17   Bank Defendants reported bids on the same class action settlements of less than 0.5% a year,

18   without any desire to outbid each other.

19   69.   Defendants agreed to a scheme whereby: (a) the Bank Defendants would pay the

20   Administrator Defendants a substantial portion of the difference between the interest rate

21   reported on the QSF deposit, and the market interest rate; (b) the Administrator Defendants

22   agreed in exchange to keep all of their class action settlement deposits with the two Bank

23   Defendants; (c) the Bank Defendants would provide identical or near-identical bids, amounting

24   to a substantially depressed interest rate for class members, on all QSF deposits, and maintain

25   those interest rates thereafter; and (d) deposit the kickbacks into SPEs separately created by the

26   Administrator Defendants to hide the scheme.

27                    ***Defendants' Illicit Kickbacks As Exemplified by Specific Settlements***

28   70.   Concealed from the courts who approved the Administrator Defendants, the amount

of their compensation for settlement administration services included additional undisclosed kickbacks they received from the Bank Defendants. The Administrator Defendants thereby received compensation that significantly exceeds the amounts they disclosed to the courts and settlement class members.

71. As discussed above, Defendants are fiduciaries of the settlement class members in the class actions. Their compensation and terms had to be reviewed and approved by the courts as part of a preliminary approval process, and then as part of the final approval process. None of the Defendants' undisclosed compensations and renumerations were ever submitted for preliminary or final approval by courts, and these illicit gains have never been approved by any court. They remain hidden even today and are the proper subject of discovery in this case.

72. Plaintiff and her counsel have investigated a number of class actions, in which Defendants informed counsel (and the managing courts) that the deposits on the QSF earned less than 0.5% interest, when the market rate on an interest-bearing account was far higher on the deposit.

73. Given the Defendants' collusion and respective market power in the Settlement Deposit Market, there was no recourse other than to accept those terms. Plaintiff and her counsel are informed by current and former employees of the Bank Defendants, and believe and allege on that basis, that the Bank Defendants paid, and the Administrator Defendants received, at minimum, the difference between the market rate on an interest bearing account and the interest that the Bank Defendants paid to the class members, including but not limited to, the following cases, in Paragraphs 74 through 93.

**Epiq**

74. In each of the following cases, Defendant Epiq and the Bank Defendants – court appointed fiduciaries for the settlement class – reported that the interest earned on the QSF was less than 0.5%, when the market rate on an interest-bearing account was between 4-6% of the deposit. And in fact, the Bank Defendants paid, and Defendant Epiq received renumerations, incentives, and compensation (collectively, as kickbacks) equal to some certain sum of the difference between the market rate for interest bearing accounts and what was actually paid for

the QSF.

75.  In the case of *In re: Capital One Consumer Data Security Breach Litigation*, MDL Case No. 1:19md2915 (AJT/JFA), there were approximately 97 million class members. The terms for the settlement class received preliminary approval on February 7, 2022, and the terms received final approval on September 13, 2022.

76.  Defendant Huntington was the trustee bank for the QSF for *In re: Capital One*:



77.  The final interest reported by Defendants Epiq and Huntington on *In re: Capital One* was less than 0.5%, which was far less than the market rate. Defendant Huntington in fact paid a sum certain between the market rate and the reported rate to Defendant Epiq, and this additional renumeration, consideration, and/or compensation was not disclosed by Defendant Epiq or Huntington.

78.  In the case of *Jowharah Hameed-Bolden et al v. Forever 21 Retail, Inc. et al*, C.D. Cal. Case No. 2:18-cv-03019-GW-JPR, there were approximately 500,000 class members. The terms for the settlement class received preliminary approval on October 21, 2021, and the terms received final approval on October 11, 2022.

79.  The final interest reported by Defendant Epiq and Bank Defendants on *Hameed-Bolden et al v. Forever 21* was less than 0.5%, which was far less than the market rate. Bank Defendants in fact paid a sum certain between the market rate and the reported rate to Epiq, and

this additional renumeration, consideration, and/or compensation (collectively, as kickbacks) was not disclosed by Epiq or Bank Defendants.

### Angeion

80.  In each of the following cases, Defendant Angeion and the Bank Defendants – court appointed fiduciaries for the settlement class – reported that the interest earned on the QSF was less than 0.5%, when the market rate on an interest-bearing account was between 4-6% of the deposit. And in fact, the Bank Defendants paid, and Defendant Angeion received renumerations, incentives, and compensation (collectively, as kickbacks) equal to some certain sum of the difference between the market rate for interest bearing accounts and what was actually paid for the QSF.

81.  In the case of *Culbertson et al v. Deloitte Consulting LLP*, there were approximately 19,000 class members. The terms for the settlement class received preliminary approval on Aug. 27, 2021, and the terms received final approval on Feb. 16, 2022.

82.  The final interest reported by Angeion and Bank Defendant in *Culbertson et al v. Deloitte Consulting LLP* was less than 0.5%, which was far less than the market rate. Bank Defendants in fact paid a sum certain between the market rate and the reported rate to Angeion, and this additional renumeration, consideration, and/or compensation was not disclosed by Angeion or Bank Defendants.

83.  In the case of *Stoffers v. Daves Inc.*, 20STCV35381 (LASC) there were approximately 243,000 class members. The terms for the settlement class received preliminary approval on May 17, 2023.

84.  The final interest reported by Angeion and Bank Defendant in *Stoffers v. Daves* was less than 0.5%, which was far less than the market rate. Bank Defendants in fact paid a sum certain between the market rate and the reported rate to Angeion, and this additional renumeration, consideration, and/or compensation was not disclosed by Angeion or Bank Defendants.

85.  In the case of *Guarnaschelli et al. v. East River Medical Imaging, P.C.*, there were approximately 455,000 class members. The terms for the settlement class received preliminary

1    approval on June 25, 2024, and the terms received final approval on May 13, 2025.

2    86.  The final interest reported by Angeion and Bank Defendant in *Guarnaschelli et al.*

3    *v. East River* was less than 0.5%, which was far less than the market rate. Bank Defendants in

4    fact paid a sum certain between the market rate and the reported rate to Angeion, and this

5    additional renumeration, consideration, and/or compensation was not disclosed by Angeion or

6    Bank Defendants.

7                            **Kroll and Western**

8    87.  In the case of *In re: Yahoo! Inc. Customer Data Security Breach Litigation,* Case No.

9    5:16-md-02752-LHK (N.D. Cal.), there were approximately 194 million class members. The

10   terms for the settlement class received preliminary approval on July 20, 2019, and the terms

11   received final approval on January 31, 2020.

12   88.  Defendant Western was the trustee bank for the QSF for *In re: Yahoo*:



22   89.  The final interest reported by Defendants Kroll and Western on *In re: Yahoo!* was

23   less than 0.5%, which was far less than the market rate. Western in fact paid Kroll a sum certain

24   between the market rate and the reported rate, and this additional renumeration, consideration,

25   and/or compensation was not disclosed by Defendants Kroll or Western.

26   90.  In the case of *Smith, et al. v. BHG XXXIV, LLC and BHG Holdings, LLC d/b/a*

27   *Behavioral Health Group*, there were approximately 197,507 class members. The terms for the

28   settlement class received preliminary approval on June 24, 2024, and the terms received final

CLASS ACTION COMPLAINT
20

approval on October 29, 2024.

91.   The final interest reported by Defendant Western on *Smith* was less than 0.5%, which was far less than the market rate. Defendant Western in fact paid Administrator Defendants a sum certain between the market rate and the reported rate, and this additional renumeration, consideration, and/or compensation was not disclosed by Administrator Defendants or Defendant Western.

### JND

92.   Plaintiff and counsel are informed, and on that basis believe and allege, that during the relevant period, JND participated in class cases as the settlement administrator and similarly took kickbacks and undisclosed renumerations. JND then stopped taking kickbacks for itself for a period, but then started making the demand again more recently.

93.   Plaintiff and counsel are informed, and on that basis believe and allege, that JND acted in concert with all Defendants, including the other Administrator Defendants, by at minimum, knowing about the secret kickbacks amongst the Defendants, and not revealing it to the courts, attorneys, or Class Members. In fact, Plaintiff and counsel are informed, and on that basis believe and allege, that JND had multiple opportunities to inform the courts, attorneys, and Class Members, but chose not to because of the kickbacks and enumerations they already took. In addition, for bids allegedly against other Administrator Defendants for class action settlements, Plaintiff and counsel are informed, and on that basis believe and alleged, that JND continued to act in concert with the other Administrator Defendants, by keeping its quotes consistent with the other Administrator Defendants, and maintaining the return quotes from the Bank Defendants consistent with the scheme.

### Defendants Formed and Used SPEs to Receive the Kickbacks

94.   Plaintiff and her counsel are informed by current and former employees of the Bank Defendants, and on that basis believe and allege, that for the aforementioned cases in Paragraphs 1 through 82 – in addition to the vast majority of the cases conducted between the Defendants the last four years – the Bank Defendants paid, and the Administrator Defendants received, the difference between the market rate on an interest bearing account and the interest that the Bank

Defendants paid to the class members, through SPEs that the Administrator Defendants formed to receive such kickbacks, and to which the Bank Defendants knowingly paid. And these SPEs – and their covert purpose – were not disclosed to the courts, class members, or settlement class counsel.

95.   Plaintiff and her counsel are informed, and on that basis believe and allege, that discovery will reveal the actual names of these SPEs, as evidenced by the entities to which the Bank Defendants paid, and the accounts from which the Administrator Defendants (and their principals and co-conspirators) withdrew for their gain and enrichment.

***The Likelihood That the Bank Defendants Will Successfully Maintain Their Market Power and Continue to Suppress Rates and Payouts***

96.   Plaintiff and her counsel are informed by current and former employees of the Bank Defendants, and on that basis believe and allege, that these illegal and anticompetitive agreements have now been maintained for years, and there is a high likelihood that these practices will continue if the courts do not intervene.

97.   Specifically, Defendants control thousands of class actions, and there are currently no sizeable competitors to the Bank Defendants to threaten their market power. In fact, prior to the filing of this Complaint, the Administrator Defendants continued to recommend the two Bank Defendants, explaining that there are no other viable alternatives of scale for the handling of QSFs.

98.   As the day of the filing of this Complaint, the quoted interest rate on QSF deposits from all Defendants remains less than 0.5% per year, although the federal window interest rate is now 4.33%. Counsel confirmed the quotes from the Bank Defendants prior to the filing of this Complaint.

***Defendant's Fraudulent Concealment***

99.   Throughout the relevant period, Defendants affirmatively and fraudulently concealed their unlawful conduct.

100. Plaintiff and Class Members did not discover and could not have discovered, through the exercise of reasonable diligence, the existence of the conspiracy and collusion alleged herein

until the first filing of this Complaint. That is because Defendants and their co-conspirators actively and fraudulently concealed the existence of their agreements, combinations and/or conspiracy. Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiff and Class Members were unaware of Defendants' unlawful conduct alleged herein and did not know that they were receiving artificially low payouts from their class action QSFs.

101. Defendants engaged in a successful, illegal conspiracy to suppress interest rates and payouts on class action settlements, by actively and affirmatively engaging in the following conduct, at minimum:

    a)    Concealing and failing to disclose their kickbacks and artificial suppression of class action payouts to the reviewing courts;

    b)    Concealing and failing to disclose their kickbacks and artificial suppression of class action payouts to the parties' attorneys of record;

    c)    Concealing and failing to disclose their kickbacks and artificial suppression of class action payouts in the Class Notices to Class Members;

    d)    Concealing and failing to disclose their kickbacks and artificial suppression of class action payments in the Class Websites;

    e)    Concealing and failing to disclose their kickbacks and artificial suppression of class action payments to the Attorney Generals, in the CAFA Notices;

    f)    Concealing and failing to submit their kickbacks and other renumerations arising from the scheme to the reviewing courts, for preliminary and final approval;

    g)    Sending and receiving the kickbacks and other renumerations arising from the scheme through SPE's to further avoid detection; and

    h)    Carrying on the scheme by agreeing to continue suppressing bids and interest rates for new cases brought to them by class action counsel.

102. Only because Defendants failed to meet the trust that the courts and American public

put in them were Defendants allowed to perpetuate the anticompetitive and illegal scheme for so long. At all relevant times, disclosures of these kickbacks and artificial suppression of class settlement payouts were material to the courts, class members, and class counsel. If disclosed, these kickbacks and artificial suppression of class settlement payouts would have gone to the nature of the bargain and been essential aspects of the transaction. No court would have approved any settlement with such kickbacks; the parties to the settlements would demanded that the Defendants be fired; the AGs and other regulators would have sought to detain the perpetrators; and the American public and Class Members would have absolutely objected to the kickbacks, as they do now.

## **CLASS ALLEGATIONS**

103. Plaintiff brings all counts, as set forth below, individually and as a Class action, pursuant to the provisions of the Fed. R. Civ. P. 23, on behalf of a Class defined as:

> Class 1 – All persons in the United States who were members of a settlement class in which (a) the Administrator Defendants provided claims administration services, (b) the Bank Defendants distributed Qualified Settlement Funds pursuant to U.S. Treasury Regulations §1.468B3(e), and (c) whose distributions from the settlement were reduced in part by renumeration, incentives, or compensation of any kind to the Administrator Defendants.

> Class 2 – All persons in the State of California who were members of a settlement class in which (a) the Administrator Defendants provided claims administration services, (b) the Bank Defendants distributed Qualified Settlement Funds pursuant to U.S. Treasury Regulations §1.468B3(e), and (c) whose distributions from the settlement were reduced in part by renumeration, incentives, or compensation of any kind to the Administrator Defendants.

> Class 3 – All persons in the United States who were members of a settlement class in which (a) the Administrator Defendants provided claims administration services, (b) the Bank Defendants distributed Qualified Settlement Funds pursuant to U.S. Treasury Regulations §1.468B3(e), and (c) whose distributions from the settlement were reduced because the Bank Defendants did not pay market interest rates on the deposits for that settlement.

104. Excluded from the Classes are Defendants, their subsidiaries and affiliates, officers

and directors, any entity in which Defendants have a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

105. The proposed Class definitions are based on the information available to Plaintiff at this time. Plaintiff may modify the Class definitions in an amended pleading or when they move for Class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

106. **Numerosity – Fed. R. Civ. P. 23(a)(1):** Plaintiff is informed and believes, and thereon alleges, that there are, at minimum, hundreds of thousands of members of the Classes described above. The exact size of the Classes and the identities of the individual members are identifiable through Defendants' records.

107. The Classes are readily ascertainable from Defendants' business records, which identify the class members of each and every case in which Defendants have served as settlement administrators, and such records also include contact information such as mailing addresses, email addresses, and telephone numbers.

108. **Commonality – Fed. R. Civ. P. 23(a)(2):** This action involves questions of law and fact common to the Class. Such common questions include, but are not limited to:

a) Whether Defendants were fiduciaries with respect to Plaintiff and the Classes, and whether Defendants breached their duties;

b) Whether Defendants engaged in fraud by omission;

c) Whether Defendants were engaged in an anticompetitive scheme, in violation of Section 1 of the Sherman Act, 15 U.S.C. §§ 1-7;

d) Whether Defendants violated the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968;

e) Whether Defendants breached their contracts for services;

f) Whether Defendants were unjustly enriched by the scheme of undisclosed renumeration, incentives, and compensation;

g) When Defendants violated the California Unfair Competition Law,

Section 17200; and

h)    Whether Plaintiff and Class members are entitled to damages as a result of Defendants' wrongful conduct, including but not limited to restitution and/or disgorgement.

109. **Typicality – Fed. R. Civ. P. 23(a)(3):** Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same unlawful and wilful conduct. Plaintiff and the Class were all members of a settlement class in which (a) the Administrator Defendants provided claims administration services, and (b) the Bank Defendants distributed Qualified Settlement Funds pursuant to U.S. Treasury Regulations §1.468B3(e), and (c) whose distributions from the settlement were reduced.

110. **Adequacy of Representation – Fed. R. Civ. P. 23(a)(3):** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the other Class members Plaintiff seeks to represent; Plaintiff has retained counsel competent and experienced in complex Class action litigation; Plaintiff intends to prosecute this action vigorously; and Plaintiff's counsel have adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Furthermore, the interests of the Class members will be fairly and adequately protected and represented by Plaintiff and Plaintiff's counsel.

111. **Predominance and Superiority – Fed. R. Civ. P. 23(b)(3):** The proposed Class action is appropriate for certification because questions of law and fact common to the members of the Class predominate over questions affecting only individual members. Also, a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action

as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

112. Defendants have acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, equitable relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

113. In addition, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

114. Finally, Defendants have access to Class members' names, email addresses, and mailing addresses from the class action settlements they administered. Defendants have already preliminarily identified Class members for the purposes of administering claims administration services, and distributing Qualified Settlement Funds pursuant to U.S. Treasury Regulations §1.468B3(e).

## CLAIMS FOR RELIEF

## COUNT I

## BREACH OF FIDUCIARY DUTY (ALL DEFENDANTS)

115. Plaintiff repeats all previous allegations in Paragraphs 1 through 114 and incorporate them herein.

116. As the court-appointed and/or court-approved mass tort and class action settlement administrator and accompanying trustee bank in numerous cases, Defendants owed Plaintiff and Class Members fiduciary duties, including of loyalty and care and an obligation to act in good faith, with candour and honesty, and to make complete and accurate disclosures to the courts, Plaintiff, and Class Members.

117. At all relevant times, Defendants were court-approved and duly appointed fiduciaries for Plaintiffs and Class Members in various class action settlements, in that they exercised discretionary authority or control over the administration and/or management of such QSFs or the disposition of QSFs' assets.

118. As fiduciaries for Plaintiff and Class Members, Defendants were subject to certain

fiduciary duties, including the duties of care and loyalty with respect to managing the assets of QSFs for the sole and exclusive benefit of Plaintiff and Class Members. In particular, Defendants were obligated to act with the care, skill, diligence, and prudence under the circumstances that an honest and loyal person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

119. Defendants breached these fiduciary duties in multiple respects, as discussed throughout this Complaint. Defendants did not act or make decisions concerning the management of the various QSFs based solely on the interests of Plaintiff and Class Members. Instead, Defendants placed their own financial interests before those of Plaintiff and Class Members by entering into clandestine schemes to obtain benefits that were retained by Defendants and/or their wholly owned subsidiaries, including SPEs, rather than being used to benefit the classes in the settlements Defendants were charged with administering. Defendants profited off of Plaintiff's and Class Members' funds in ways that they did not disclose to Plaintiff and Class Members whom they owed a fiduciary duty.

120. As a direct and proximate result of the breaches of fiduciary duties alleged herein, Plaintiff and the Class Members suffered damages in an amount to be determined at trial.

121. As a direct and proximate result of the breaches of fiduciary duties alleged herein, Plaintiff and the Class Members were denied the benefit of the revenue generated interest payments, which Defendants could have used to offset the costs of settlement administration.

122. Defendants are liable to restore to each QSF all losses caused by their breaches of fiduciary duties and also must restore any profits Defendants received as a result of such breaches.

123. In addition, Plaintiff and the Class are entitled to equitable relief, including equitable accounting, and other appropriate relief for Defendants' breach of their fiduciary duties, as set forth in the Prayer for Relief.

## COUNT II

## FRAUD (ADMINISTRATOR DEFENDANTS)

124. Plaintiff repeats all previous allegations in Paragraphs 1 through 123 and incorporate them herein.

125. Administrator Defendants are responsible for sending class settlement notices to Class Members. These Class Settlement Notices may be transmitted by U.S. mail or email, and are administered by the Administrator Defendants. In addition, the Administrator Defendants also set up Class Settlement Websites that detail the class action settlements. These websites are usually set up 90 to 120 days before the motion for preliminary approval hearing.

126. For both the Class Settlement Notices and Class Settlement Websites, each and every material detail regarding the settlement is supposed to be provided to the Class Members, so that they can decide if they want to make a claim, ask questions, or otherwise object. The reason why the courts require such notices, is so Class Members can review, participate, and object to settlement distributions if they so choose. Thus, the secret renumerations, incentives, and compensations received by the Administrator Defendants needed to be disclosed in these notices and disclosures, as the kickbacks materially affected the settlements as it goes to the nature of the bargain and goes to the essential aspects of the transaction. That any party was receiving significant percentages of the settlement proceeds needed to be identified in the Class Settlement Notices and Class Settlement Websites, as such compensation are ultimately paid out of the gross settlement proceeds and diminish the amount of money available to compensate the Class Members in such cases.

127. Yet, in each and every Class Settlement Notice and Class Settlement Website, none of the secret renumerations, incentives, and compensations received by the Administrator Defendants were ever disclosed.

128. Further, for each and every settlement presented to the courts for preliminary and final approval, no discussion of the additional renumerations, incentives, or compensations received by the Administrator Defendants were presented for approval, because no one other than the Defendants were aware of the secret transactions, deals, or agreements. Similarly, there was no disclosure of the anticompetitive conduct between the Defendants as detailed below in Count III and IV. Paragraphs 137 to 153 of Count III and IV shall be incorporated herein.

129. The Administrator Defendants not only failed to disclose these material remunerations, incentives, and compensations and their anticompetitive conduct between the

Defendants but the Administrator Defendants also affirmatively falsely represented to Plaintiff, Class Members, and the courts the compensation they were receiving for providing settlement administration services in class actions.

130. At all times relevant to this action, the Administrator Defendants knew or recklessly disregarded the falsity of their representations in their bids, proposals, agreements, and contracts concerning the compensation they would receive for providing settlement administration services in class actions.

131. At all times relevant to this action, the Administrator Defendants intended to deceive Plaintiff, Class Members, and courts, including in the decision-making process for selecting settlement administrators, how and what payments are made from the QSFs, and whether the courts would ultimately approve the final distributions. And the Administrators did so in order to obtain money or property that otherwise belonged to Plaintiff and Class Members.

132. The Administrator Defendants intended to induce Plaintiff, Class Members, and courts to approve or not object to the settlements on the terms the Administrator Defendants wanted, relying on the Administrator Defendants false and misleading statements and omissions concerning the compensation they would receive for providing settlement administration services in class actions.

133. Plaintiff and Class Members and the approving court, in fact, relied on the Administrator Defendants' false and misleading statements and omissions concerning the compensation the Defendants would receive for providing settlement administration services, and on the basis of such misrepresentations, allowed the Administrator Defendants to be selected as the administrators for thousands of class actions and mass tort cases. Had Plaintiff and Class Members and the courts known, the Administrator Defendants would have never been selected or would have been selected but on materially different terms.

134. Plaintiff's and Class Members' and the approving court's reliance on Defendants' false and misleading statements and omissions concerning the compensation of the Defendants was at all times reasonable. Indeed, no amount of diligence on the part of Plaintiff and the Class Members and the approving court would have revealed Defendants' deceptive scheme.

135. Reliance upon the Administrator Defendants' false and misleading statements and omissions concerning the compensation of Defendants caused actual financial harm and damage to Plaintiff and the Class Members in thousands of cases. At minimum, Plaintiff and Class Members would have received greater recoveries in such settlements if the kickbacks that the Administrator Defendants had been used to offset settlement administration expenses, rather than to line Administrator Defendants' own pockets.

136. As a direct and proximate result of the Administrator Defendants' fraudulent conduct, Plaintiff and Class Members are entitled to damages, including compensatory, equitable, and/or punitive damages, in an amount to be proven at trial.

## COUNT III

### VIOLATION OF THE SHERMAN ACT, SECTION 1 (ADMINISTRATOR DEFENDANTS)

137. Plaintiff repeats all previous allegations in Paragraphs 1 through 136 and incorporates them herein.

138. Beginning sometime in 2021, the exact date being unknown to the Plaintiff and Class Members, being exclusively within the knowledge of Defendants, the Administrator Defendants and their co-conspirators entered into a continuing contract, combination, and/or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

139. The Administrator Defendants agreed with each other that they would implement a scheme to raise, fix, maintain, or stabilize the cost of class action settlement administration services.

140. Each Administrator Defendant proceeded to act accordingly, in concert with one another. Indeed, during the times relevant, each of them made such demands on the Bank Defendants, received illegal and unfair renumerations from the Bank Defendants, and proceeded to hide these illicit transactions for themselves, and for each other. That the Administrator Defendants have been acting in concert to keeping the kickbacks secret is easily evidenced by how little courts knew about these clandestine practices, and how the Administrator Defendants

have been received the renumerations in SPEs.

141. Amongst the important effects of these concerted actions by the Administrator Defendants is that it raised the price of class action settlement administration services, and lowered the total payouts to Plaintiff and Class Members. Had the secret renumerations to the Administrator Defendants not been made, the money would have either reduced the costs of administration, or more money would have been paid out to Plaintiff and Class Members.

142. As a result of Defendants' unlawful conduct, the cost of class action administrator in the Administrator Market in the United States have been raised, fixed, maintained, or stabilized.

143. The contract, combination, and/or conspiracy amongst Defendants consisted of a continuing agreement, understanding, and concerted action among the Administrator Defendants and their co-conspirators.

144. For purposes of formulating and effectuating their contract, combination, and/or conspiracy, the Administrator Defendants and their co-conspirators did those things they contracted, combined for, and conspired to do, including:

    a)   Participating in meetings and conversations to discuss the costs and payments of class action settlement administration;

    b)   Communicating orally and in writing to fix the costs on class action settlement administration;

    c)   Agreeing to manipulate the payouts and costs of class action administration in the United States, in a manner that deprived Class Members and the country of free and open competition;

    d)   Issuing quotes and bids in accordance with the agreements reached;

    e)   Selling class administration services, including services for the Administrator Market, at noncompetitive prices;

    f)   Providing false statements to the public, including the courts, the AGs, the parties' attorneys, and the Class Members, regarding the

noncompetitive prices of class action administration and the subsequent payouts; and

g)    Helping to set up and paying the kickbacks into SPEs to receive the payments.

145. As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and Class Members have been injured in that they paid more for settlement administration services than they needed to, and received less payouts than they otherwise would have, in an amount to be proven at trial.

146. In addition to being per se unlawful, there is and was no legitimate, non-pretextual, pro-competitive business justification for Defendants' agreement that outweighs its harmful effect on Plaintiff and Class Members and on competition.

## **COUNT IV**

**VIOLATION OF THE SHERMAN ACT, SECTION 1 (BANK DEFENDANTS)**

147. Plaintiff repeats all previous allegations in Paragraphs 1 through 146 and incorporates them herein.

148. Beginning sometime in 2021, the exact date being unknown to the Plaintiff and Class Members, being exclusively within the knowledge of Defendants, the Bank Defendants and their co-conspirators entered into a continuing contract, combination, and/or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

149. In particular, Defendants have combined and conspired to depress, fix, maintain, or stabilize the payouts on class action settlements in the Settlement Deposit Market in the United States.

150. As a result of Defendants' unlawful conduct, the payouts on class action settlements the Settlement Deposit Market in the United States have been depressed, fixed, maintained, or stabilized.

151. The contract, combination, and/or conspiracy amongst Defendants consisted of a

continuing agreement, understanding, and concerted action among the Bank Defendants and their co-conspirators.

152. For purposes of formulating and effectuating their contract, combination, and/or conspiracy, the Bank Defendants and their co-conspirators did those things they contracted, combined for, and conspired to do, including:

a)   Participating in meetings and conversations to discuss the payouts on class action settlements;

b)   Communicating orally and in writing to fix the payouts on class action settlements;

c)   Agreeing to manipulate the payouts of QSFs and the costs of class action administration in the United States, in a manner that deprived Class Members and the country of free and open competition;

d)   Issuing quotes and bids in accordance with the agreements reached;

e)   Selling class administration services, including services for the Settlement Deposit Market, at noncompetitive prices;

f)   Providing false statements to the public, including the courts, the AGs, the parties' attorneys, and the Class Members, regarding the noncompetitive prices and payouts on QSFs; and

g)   Helping to set up and paying the kickbacks into SPEs to receive the payments.

153. As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and Class Members have been injured in that they paid more for class actions than they needed to, and received less payouts than they otherwise would have, in an amount to be proven at trial.

154. In addition to being per se unlawful, there is and was no legitimate, non-pretextual, pro-competitive business justification for Defendants' agreement that outweighs its harmful effect on Plaintiff and Class Members and on competition.

1

2

3

### <u>COUNT V</u>

**VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, SECTION 1962(C) and 1964(C) (ALL DEFENDANTS)**

4       155. Plaintiff repeats all previous allegations in Paragraphs 1 through 154 and incorporates

5    them herein.

6       156. Defendants, as well as others known and unknown, are "persons" within the meaning

7    of 18 U.S.C. § 1961(3) as entities capable of holding a legal or beneficial interest in property.

8       157. The Defendants, as well as others known and unknown, associated together and

9    engaged in racketeering practices for the common purpose of accomplishing the actions

10   described within this complaint, including but not limited to: providing the Administrator

11   Defendants with additional and undisclosed proceeds in the form of interest payments in

12   exchange for the Administrator Defendants depositing the QSFs with the Bank Defendants, all

13   while concealing this conduct from courts approving the settlements, the class members, and

14   class counsel; maintaining market share and power through anticompetitive means for the

15   Administrator Defendants and Bank Defendants; among other unlawful purposes discussed

16   herein ("Defendants' Enterprise").

17      158. Enterprise Defendants had a systemic linkage to each other participant through

18   corporate ties, contractual relationships, and employment relationships, and functioned as a

19   continuing unit for the purpose of furthering the scheme and their common purposes.

20      159. Defendants' Enterprise engaged in and affected interstate commerce, where

21   Defendants utilized phone, email, and mail in caring out its purpose, including but not limited to

22   through notices sent to class members, payments made to class members, communications with

23   the approving court and class counsel.

24      160. Defendants' Enterprise engaged in the following pattern of racketeering activity,

25   contrary to the provisions of 18 U.S.C. §§ 1962(c):

26          a)      Wire and mail fraud in violation of 18 U.S.C. § 1343 and conspiracy

27                  to commit wire and mail fraud in violation of 18 U.S.C. § 1343 as

28                  alleged in Count II. The wires and mailings used in furtherance of

Defendants' fraud scheme include but are not limited to:

- Emails and mailed communications to class members involved in the settlements described in Paragraph 74 to 93.

- Emails and mailings between Administrator Defendants and Bank Defendants relevant to the settlements described in Paragraph 74 to 93.

- Emails, mailings, and uploads of communications by the Administrator Defendants and Bank Defendants to the court (directly or indirectly).

161. Plaintiff and her counsel are informed, and on that basis believe and allege, that the Defendants' Enterprise and pattern of racketeering activity has been happening in the United States interstate commerce since at least 2021, continuing through the present.

162. As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and Class Members sustained injury to their property in that they paid more for class actions than they needed to, received less class settlement payouts than they otherwise would have, and were fraudulent induced to part with their property interest, all in an amount to be proven at trial.

163. Plaintiff and her counsel are informed by current and former employees of the Bank Defendants, and on that basis believe and allege, that the foregoing racketeering activity is ongoing and related. The Defendants amongst them control thousands of class actions, and continue to make ongoing material misrepresentations, misstatements, and omissions alleged within this complaint. For example, prior to the filing of this Complaint, the Administrator Defendants continued to recommend the two Bank Defendants, explaining that there are no other viable alternatives of scale for the handling of QSFs. And as of the day of the filing of this Complaint, the quoted interest rate on QSF deposits from Defendants remains less than 0.5% per year, although the federal window interest rate is now 4.33%.

164. Although there has been no criminal convictions of Defendants, Plaintiff and her counsel are informed, and on that basis believe and allege, that there will be criminal prosecution of Defendants.

## COUNT VI

**VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) — CONSPIRACY 18 U.S.C. 1962(D) (ALL DEFENDANTS)**

165. Plaintiff repeats all previous allegations in Paragraphs 1 through 164 and incorporates them herein.

166. Each Defendant and member of the Defendants' Enterprise agreed to commit the substantive racketeering offense through agreeing to participate in two racketeering acts.

167. Each Defendant and member of the Defendants' Enterprise agreed to commit the substantive racketeering offense through agreeing to participate in two racketeering acts.

168. Each Defendant and member of the Defendants' Enterprise knew the general status of the conspiracy was to enable and cover up the Defendants' Enterprise and its purpose.

169. Each Defendant and member of the Defendants' Enterprise knew the conspiracy extended beyond their individual role.

170. Each Defendant and member of the Defendants' Enterprise agreed and conspired to violate 18 U.S.C. § 1962(c) as set forth above in Count IV.

171. Each Defendant and member of Defendants' Enterprise knew their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above constituting a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

## COUNT VII

**BREACH OF IMPLIED CONTRACT (ALL DEFENDANTS)**

172. Plaintiff repeats all previous allegations in Paragraphs 1 through 171 and incorporates them herein.

173. As fiduciaries for the Plaintiff and Class Members, duly appointed by the courts, Defendants agreed to (a) seek approval for their compensation, and (b) provide a full accounting, as part of the preliminary and final approval process.

174. At all relevant periods, Defendants breached this implied agreement, arising from the class action approval process.

175. For both the Class Settlement Notices and Class Settlement Websites, each and every material detail regarding the settlement is supposed to be provided to the Class Members, so that they can decide if they want to make a claim, ask questions, or otherwise object. The reason why the courts require such notices, is so Class Members can review, participate, and object to settlement distributions if they so choose. Thus, the secret renumerations, incentives, and compensations received by the Administrator Defendants needed to be disclosed in these materials, as the kickbacks materially affected the settlements. That a party was to receive significant percentages of the settlement proceeds needed to be identified in the Class Settlement Notices and Class Settlement Websites, as such compensation are ultimately paid out of the gross settlement proceeds and diminish the amount of money available to compensate the Class Members in such cases.

176. Defendants failed to make these disclosures or to seek approval, thereby breaching the agreement. In each and every Class Settlement Notice and Class Settlement Website, none of the secret renumerations, incentives, and compensations received by the Administrator Defendants was ever disclosed. For each and every settlement presented to the courts for preliminary and final approval, no discussion of the additional renumerations, incentives, or compensations received by the Administrator Defendants were presented for approval by anyone, because no one other than the Defendants were aware of the secret transactions.

177. As a direct and proximate result of the Administrator Defendants' conduct breaching the implied agreement, Plaintiff and Class members are entitled to damages, including compensatory, equitable, and/or punitive damages, in an amount to be proven at trial.

<u>**COUNT VIII**</u>

**UNJUST ENRICHMENT/QUANTUM MERUIT (ALL DEFENDANTS)**

178. Plaintiff repeats all previous allegations in Paragraphs 1 through 177 and incorporates them herein.

179. As fiduciaries for the Plaintiff and Class Members, duly appointed by the courts, Defendants agreed to (a) seek approval for their compensation, and (b) provide a full accounting, as part of the preliminary and final approval process.

180. At all relevant periods, Defendants breached this responsibility imposed by law.

181. For both the Class Settlement Notices and Class Settlement Websites, each and every material detail regarding the settlement is supposed to be provided to the Class Members, so that they can decide if they want to make a claim, ask questions, or otherwise object. The reason why the courts require such notices, is so Class Members can review, participate, and object to settlement distributions if they so choose. Thus, the secret renumerations, incentives, and compensations received by the Administrator Defendants needed to be disclosed in these materials, as the kickbacks materially affected the settlements. That a party was to receive significant percentages of the settlement proceeds needed to be identified in the Class Settlement Notices and Class Settlement Websites, as such compensation are ultimately paid out of the gross settlement proceeds and diminish the amount of money available to compensate the Class Members in such cases.

182. Defendants failed to make these disclosures or to seek approval and made false disclosures of what the Administrator Defendants would receive as compensation, thereby breaching the agreement. In each and every Class Settlement Notice and Class Settlement Website, none of the secret renumerations, incentives, and compensations received by the Administrator Defendants was ever disclosed. For each and every settlement presented to the courts for preliminary and final approval, no discussion of the additional renumerations, incentives, or compensations received by the Administrator Defendants were presented for approval by anyone, because no one other than the Defendants were aware of the secret transactions.

183. As a direct and proximate result of the Defendants' fraudulent conduct, Plaintiff and Class Members are entitled to damages, including compensatory, equitable, and/or punitive damages, in an amount to be proven at trial, as the court may award in its equitable discretion.

184. As a direct and proximate result of the Defendants' fraudulent conduct, Defendants obtained money, property, or other things of value that they otherwise should not have and thus Plaintiff and Class Members are entitled to damages, including compensatory, equitable, and/or punitive damages, and/or forfeiture, restitution, and payment of unjust enrichment damages.

## COUNT IX

**CALIFORNIA UNFAIR COMPETITION LAW ("UCL"), CAL. BUS. & PROF. CODE § 17200 *ET SEQ.* (ALL DEFENDANTS BY PLAINTIFF ON BEHALF OF CLASS 2)**

185. Plaintiff repeats all previous allegations in Paragraphs 1 through 184 and incorporates them herein.

186. Defendants violated the UCL by engaging in unlawful and unfair business acts and practices, as detailed above, including without limitation with Defendants' undisclosed kickback scheme.

187. Defendants' acts and practices constitute unfair business practices, including because they are immoral, unethical, oppressive, unscrupulous, unconscionable, substantially injurious to the public, and offensive to public policy.

188. Plaintiff and the members of Class 2 suffered injury-in-fact, caused by Defendants' acts, including the loss of money as a result of Defendants' unlawful and unfair business acts and practices.

189. Defendants reaped unjust revenues and profits as a result of their unlawful and unfair business acts and practices.

190. The harm caused by Defendants' unlawful and unfair business acts and practices substantially outweigh any utility.

191. Plaintiff seeks and is entitled to all available relief in connection with Defendants' unlawful and unfair business practices, including without limitation restitution and injunctive relief.

192. Plaintiff is also entitled to recover reasonable attorneys' fees, costs, and expenses incurred under California Code of Civil Procedure § 1021.5.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, pray for relief as follows:

A.     For an order certifying this action as a class action and appointing Plaintiff as Class Representatives and their counsel as Class Counsel;

B.      For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the solicitation and receipt of kickbacks;

C.      For an accounting by Defendants;

D.      For an award of all available damages, including without limitation actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, including treble damages, as allowable by law;

E.      For all available equitable relief, including without limitation requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct and a constructive trust;

F.      For an award of punitive damages, as allowable by law;

G.      For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

H.      Pre- and post-judgment interest on any amounts awarded; and

I.      Such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

A jury trial is demanded by Plaintiff on all claims so triable.

Dated: June 5, 2025                    By */s/      Caleb H. Liang*
                                            Caleb H. Liang

**LTL ATTORNEYS LLP**
David W. Ammons, SBN 187168
Caleb H. Liang, SBN 261920
300 S. Grand Ave., Suite 3950
Los Angeles, CA 90071
Tel: (213) 612-8907
david.ammons@ltlattorneys.com
caleb.liang@ltlattorneys.com

*Attorneys for Plaintiff Nicole Rieger,*
*individually and on behalf of all others*
*similarly situated*